Filed 12/1/20  P. v. Wiley CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TERRANCE WILEY,<br><br>Defendant and Appellant. | F077587<br><br>(Super. Ct. No. BF170838A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

This case arises from what the prosecution theorized was a gang-related shooting death. The jury rejected the allegation that the murder was willful, deliberate and premeditated, but convicted defendant Terrance Wiley of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b); count 1),[1] shooting at an occupied vehicle (§ 246; count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and reckless evasion of a peace officer (Veh. Code, § 2800.2; count 4).[2] The jury found true that as to counts 1 and 2, defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (d)); and as to counts 1, 2 and 3, defendant committed the crimes for the benefit of, at the direction of or in association with the Country Boys Crips (CBC) criminal street gang (§ 186.22, subd. (b)(1)). In a bifurcated proceeding, the jury found true that defendant had a prior felony conviction for first degree burglary, within the meaning of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).)

On count 2, shooting at an occupied vehicle, the trial court sentenced defendant to an indeterminate term of 74 years to life in prison under section 186.22, subdivision (b)(4)(A).[3] On count 1, the court imposed an indeterminate term of 15 years to life for murder, doubled to 30 years under the Three Strikes law, plus an additional 25 years to life for the firearm enhancement and five years for the serious felony conviction enhancement, stayed under section 654. On count 3, the court imposed the upper term of three years for being a felon in possession of a firearm, doubled to six

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Section 29800 was amended effective January 1, 2021, but that amendment is not relevant to defendant's conviction in this case. (Sen. Bill No. 723 (2019-2020 Reg. Sess.) ch. 306, § 1, pp. 1–3.)

[3] The trial court calculated defendant's sentence on count 2 in accordance with *People v. Sok* (2010) 181 Cal.App.4th 88, 96–97: the upper term of seven years under section 246, 25 years to life for the firearm enhancement and five years for the prior serious felony enhancement, for a total of 37 years to life, doubled to 74 years under the Three Strikes law.

years, plus an additional four years for the gang enhancement, stayed under section 654. Finally, on count 4, the court sentenced defendant to a consecutive upper term of three years for reckless evasion, doubled to six years.[4]

On appeal, defendant claims that the jury's gang enhancement findings are not supported by substantial evidence. He also claims that the trial court erred when it denied his motion to bifurcate the gang enhancements and erred under Evidence Code section 352 with respect to the admission of gang rap videos, the two predicate offenses committed by him and photographs of the victim's body; and that, cumulatively, these errors violated his right to due process and a fair trial. Finally, defendant seeks remand to allow the trial court to consider whether to strike the prior serious felony conviction enhancement imposed under section 667, subdivision (a)(1) under Senate Bill No. 1393. (Stats. 2018, ch. 1013, §§ 1–2, pp. 1–6 (Senate Bill No. 1393 or Sen. Bill No. 1393).)

The People offer no concessions and argue that remand under Senate Bill No. 1393 would be futile given the trial court's comments during the sentencing hearing.

As to counts 1 through 3, we agree with defendant that the evidence is insufficient to support the jury's findings that he committed the crimes for the benefit of or in association with the CBC. However, we reject his claims of error with respect to bifurcation of the gang enhancements and admission of the gang rap videos, the two predicate offenses he committed, and the photographs of the victim's body, which also forecloses his claim of cumulative error. Because this matter must be remanded for resentencing given reversal of the gang enhancements on counts 1 through 3, the parties'

---

[4] Although the parties did not raise the issue, given that remand for resentencing is required following reversal of the gang enhancements, discussed *post*, we observe that in the oral pronouncement of judgment, the trial court stated the determinate term would be served consecutively to the indeterminate term. This language originated with the probation report, but to the extent this led to any confusion, "[w]henever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first .…" (§ 669, subd. (a); accord, *People v. Garza* (2003) 107 Cal.App.4th 1081, 1085.)

3.

dispute over the propriety of remand under Senate Bill No. 1393 is moot and we do not reach the issue.[5]

## FACTUAL SUMMARY

### I. Shootings

Kenneth Cannon, Charles Richards, and Charles Tomlin, all of whom were in their 40's, grew up together in Bakersfield. Cannon and Richards also previously worked together in construction and they acknowledged some acquaintance with defendant: Cannon said he had seen defendant around the neighborhood before and Richards said he recognized defendant because their mothers were good friends. Earlier in the evening of January 5, 2018, a group, including Richards, gathered at a house for a party. Although Richards stated at trial that he was drinking that night and no longer remembered who was there, he previously told police that Tomlin, known to Cannon and Richards as "99," and defendant, known to Richards as "Tater," were among those who attended the party.

Later that night, Cannon and Richards both went to the Westfair Lounge (hereinafter the bar) in Bakersfield, each testifying he arrived alone. Richards drove his mother's gold Chevy Impala with tinted windows and parked across the street from the front of the bar.[6] Tomlin and defendant also showed up at the bar.

Cannon, who frequented the bar most Saturday nights, saw Bruce Hollis there that night. Cannon knew Hollis because Hollis, then in his 50's, had served time in prison for killing Cannon's cousin in 1988. Cannon testified that he approached Hollis and said, "'I forgive you for what you did to my cousin 20 years ago.'" Hollis invited him to go

---

[5] In light of this disposition, defendant's request for judicial notice of the legislative history for Senate Bill No. 620 (Stats. 2017, ch. 682, §§ 1–2, pp. 1–4 (Senate Bill No. 620 or Sen. Bill No. 620)) is denied as moot.

[6] The bar and several other businesses were situated on a roughly triangular shaped lot bounded by Wilson Road to the north, Wible Road to the west, and Larson Lane to the east. The front of the bar was on the east side of the building, facing Larson Lane, and the bar's parking lot was on the north side of the building. There was a Dollar Tree store and a large parking lot on the other side of Larson across from the bar.

outside to the smoking area and talk, but he declined because it "[d]idn't feel right." Hollis kept following him around the bar trying to talk to him, however.

Tomlin also knew Cannon's late cousin. After Tomlin arrived at the bar, Cannon told Tomlin and several women that Hollis was the one who killed his cousin. Cannon testified that after he and Tomlin went outside to smoke in front of the bar, Hollis again approached and tried to talk to him. Cannon and Tomlin both told Hollis that Cannon did not want to talk to him, and Tomlin punched Hollis. Hollis then drew a handgun and shot Tomlin eight times, killing him.

After he shot Tomlin, Hollis calmly walked to his vehicle parked in the bar's parking lot. After Hollis backed out of the parking space to leave, someone stood up from a crouched position and shot Hollis six times through the driver's side of his vehicle. Although fatally wounded, Hollis was able to drive out of the parking lot, hitting another patron's vehicle in the process, and proceed about one-quarter of a mile before his vehicle veered off the road and down an embankment, coming to rest against a cement retaining wall. Hollis was found slumped over in the driver's seat, deceased. There was a .40-caliber pistol on the floorboard next to his left foot and a concealed carry holster with an extra ammunition magazine sitting on the transmission hump between the driver and passenger seats.

When officers with the Bakersfield Police Department (BPD) responded to the bar, Cannon and an unidentified man were performing CPR on Tomlin, who was lying on the ground in front of the bar surrounded by a crowd of people. Seven spent shell casings were recovered from the front of the bar where Tomlin was shot, and seven spent shell casings were recovered from the parking lot where Hollis was shot.[7]

---

[7]     The jury heard that the shell casings recovered from the parking lot were swabbed for DNA, but results were not discussed. During motions in limine, the prosecutor noted that the case went to trial three months after the shooting and indicated that the swabs were not submitted for processing due to time constraints.

## II.     Flight from Scene

Several people called 911 to report the shootings.  An unidentified female caller reported Hollis's shooting in the parking lot and described the shooter as a Black male on foot dressed in black and wearing a black "hoodie."  An unidentified male caller reported Tomlin's shooting in front of the bar.  He did not mention a second shooting, but reported that a Black man "left from there right away[]" in a gold car, possibly a Grand Am, and headed eastbound.  Officer Mueller was two miles from the bar when he saw a gold sedan on eastbound Wilson Road waiting at a red light to turn left onto Union Avenue.

Aware of the report that a gold sedan fled eastbound from the scene of the shootings, Mueller made a U-turn in his patrol vehicle to follow the sedan.  The driver of the gold sedan then ran the red light and proceeded northbound with Mueller in pursuit.  The driver ran several stop signs and reached speeds of more than 100 miles per hour in 30-mile-per-hour zones.  The vehicle slowly came to a rest after becoming airborne and landing hard on all four wheels.  As soon as the vehicle came to a rest, defendant got out and surrendered without incident.  No one else was in the car.

The sedan, a gold Impala, was registered to either Richards or his mother.[8]  Inside the sedan, police found a black ZTE cell phone on the driver's seat, which was later linked to defendant's sister through phone records.[9]  An orange sweatshirt and a black beanie with a "Soul Fresh" logo were on the front passenger floorboard, and a black hooded sweatshirt was on the rear passenger floorboard.  Richards, who worked in construction, said the sweatshirt was probably his for work, but he denied the beanie and black sweatshirt were his.  There was no firearm on defendant or in the sedan, and police

---

[8]     Richards testified the Impala was registered to his mother, and a detective testified he "believe[d]" he located registration paperwork with Richards's name on it.

[9]     Defendant's sister testified that he did not have his own phone and she lent him her phone earlier that day.

did not find anything when they searched around the bar and along defendant's flight route.

### III. Shooter's Identity

The main issue at trial was the identity of the man who killed Hollis. At the time of his arrest, defendant, who is Black, was wearing a black T-shirt with a large graphic on the front that included a lot of white in the design; shorts with what a detective described as a dark camouflage pattern; black socks; and athletic shoes that had a lot of white in the design, including around the bottom.[10] The jury saw photographs of defendant and his clothing following his arrest, and his clothing and shoes were also admitted into evidence. Detective Littlefield, who reviewed the surveillance camera footage from the bar, summarized below, testified that defendant was the only person he saw who was wearing shorts that night.

#### A. Cannon and Richards

Cannon stated he could not recall who was present outside when Hollis began shooting because he was "dizzy drunk[,]" but he thinks Richards might have been sitting on a bench. Notwithstanding contrary video surveillance footage, Cannon testified that as soon as Hollis began shooting, he ran east to the Dollar Tree parking lot. Cannon denied seeing defendant inside the bar that night, but said he might have seen defendant in the Dollar General parking lot after Tomlin was shot. He also denied he knew where defendant went or that he saw a gold Impala. Cannon stated he heard a second set of shots, but did not know where they were coming from, and he eventually walked back to where Tomlin was and tried to assist the person giving Tomlin CPR. After the ambulance arrived, he and Richards walked to the Valero gas station on Wilson Road and waited for an Uber ride to the hospital.

---

[10] From the photographic evidence, defendant's athletic-style shorts came down to his knees and were abstract patterned in gray, blue, and black with a gray stripe down the sides.

Richards testified that he was sitting outside on a bench trying to sober up when he heard a burst of gunshots. He ran and then heard a second burst. He heard someone calling for an ambulance, returned, and saw Cannon and someone else giving CPR to Tomlin. After the ambulance arrived and police cleared the area, he noticed his car keys and car were missing. Richards acknowledged defendant was at the bar that night after viewing surveillance footage in court, but he denied they arrived at the bar together, denied knowing where defendant was at the time of the shooting and said he had no idea how defendant ended up with his car keys.

**B.     J.C.**

**1.     Trial Testimony**

At trial, J.C., who was in custody at the time for previously failing to appear, was no longer able to remember some of the details he initially reported to police, and he was unable to identify defendant as the man he saw that night. However, he testified that he went to the bar often and planned to meet his brother there that night to play pool. He thought it was sometime after midnight, closer to 1:00 a.m. He parked in the well-lit Dollar Tree parking lot across the street from the bar. From inside his truck, he had a partial view of the front of the bar, including the bench area where Tomlin was shot. J.C. sat in his truck for 15 or 20 minutes, debating whether to get out because he did not want any problems. He said the crowd mix varied depending on the night and it could get a little rough at times. He called his brother to tell him not to come "when all the commotion kicked off."

J.C. said there was a dark car parked on his right with no one inside. A gold, four-door compact car pulled in on the right side of the dark car and parked diagonally across the parking spaces, which caught his attention. He did not recall it having tinted windows, but said he could not see the driver at all due to the dark car parked next to him. Two Black men got out of the car. One was wearing black and appeared "all black[,]" and the other had some lighter clothing. They walked halfway to the bar and

8.

then returned to the car. J.C. saw them briefly handling a fluorescent orange "work shirt type thing[]" from the passenger side of the car and then they walked across the street toward the bar. J.C. lost sight of them at that point because a bush obscured his view. He did not know if the car was running or not, but its lights were off.

J.C. heard a gunshot, looked up, and saw a tall man in dark clothing standing over another man who was on the ground by the bench in front of the bar with his hands up. J.C. said the man fired again and he saw a muzzle flash. J.C. thought he heard three shots, but he is only able to hear out of one ear and he was on his phone at the time. He started his truck to leave after the second shot. The shooter walked away toward the bar's patio area and disappeared from J.C.'s view.

A man then ran from the north parking lot of the bar across the street directly to the gold car and "dove" into the back seat. The car almost immediately took off, screeched out of the parking lot, and headed east on Wilson Road. Because it happened so quickly, J.C. thought there must have been a driver waiting in the car, but he could not see into the driver's side. J.C. called his brother at 12:49 a.m. to say he witnessed a shooting and he called 911 at 1:01 a.m., after driving home.

J.C. said the black hoodie and socks he viewed in court were the same or similar to those worn by the man who ran and jumped into the car before it took off. He was unsure about the shoes, but recalled the man's shoes were light colored.

### 2.     911 Call

J.C.'s 911 call was played for the jury. J.C. reported witnessing the shooting in front of the bar and then hearing more shots fired. He mentioned that three men got out of the car when it arrived and that after the shootings, he saw a Black man with a hood and shorts run to the gold, four-door compact car after the shooting.

### 3.     On-scene Statement

J.C. was transported to the scene of defendant's arrest, and his recorded statement was played for the jury. J.C. said he was not sure about the car at first because he had

9.

thought it was Camry or something other than an Impala, but he said the Impala was the same color and he recognized the orange sweatshirt, which was displayed for him after he mentioned seeing the men with an orange- or yellow-striped sweatshirt.[11] Officers also had J.C. view defendant, but he said he could not be certain because he did not see the man's face. He said the men did not have hoods up when they exited the car, but the man who ran back to the car had on a black-hooded sweatshirt, or "hoodie," with the hood up and he was wearing shorts that looked like the ones defendant had on when he was arrested.

### 4. Interview Statement

J.C.'s audio-video recorded interview at the police station was also played for the jury. J.C. told Detectives Shaff and Koerner that three men got out of the gold compact car after it parked near him and were talking. All three men were Black and were wearing black or dark clothing. The first man had on a black hoodie with the hood down, dark patterned shorts with grey, and dark socks; the second man was in all dark clothing with black pants and a long top on; and the third man had hair. All three men started walking toward the bar. The second man kept going, but the other two returned to the car and retrieved an orange blanket or sweatshirt from the car that had an object wrapped in it. The men then put the orange thing back in the car and walked across the street to the bar.

It was dark and J.C. saw a lot of black, but he described seeing the shooting in front of the bar and thought a person who looked like the second man was the shooter. He said the shooter "walked away like nothing[,]" and he lost sight of the man. J.C. then heard more gunshots and saw the first man in the hoodie run back to the car from the direction of the parking lot where the shots were fired. The man had his hood up and he

---

[11] J.C. clarified at trial that he was just trying to describe something a roadworker would wear.

"dove in" the passenger area of the car, which then "took off fast" eastbound on Wilson Road. J.C. could not see the driver and although he did not see anyone return to the car except the runner, he thought there could have been a fourth person in the car when it arrived and he said, "Somebody was already sitting in there waiting."

### C. R.K. and C.N.

R.K. was a regular at the bar and he arrived around 10:30 p.m. He saw C.N. there, whom he knew, and he spent most of his time outside on the patio with her. C.N. knew Hollis, but R.K. did not. After C.N. intervened in an argument between Hollis and Cannon in front of the bar, R.K. told one of her friends to go get her. She returned to the patio and R.K. then heard multiple gunshots coming from the front of the bar. He pulled his friends down to the ground and, through the security bars that enclosed the patio, he saw Hollis walk by at a normal pace and get into his vehicle. A shadowy figure approached Hollis, and R.K. told his friends to get down because it was not over with. R.K. saw Hollis get shot and then saw Hollis hit his truck on the way out of the parking lot.

R.K. said the shooter wore a plain, dark blue or black hoodie, but he did not see the person's face, did not know the person's race, and did not see the person in the bar earlier. He also said he did not know where the shooter went and did not recall telling law enforcement the person ran toward Dollar Tree, but after reviewing his prior statement, he said the shooter ran east toward the front of the bar and Larson Street.

After looking at the damage to his truck outside, R.K., who was unlicensed and did not have registration or insurance, left. The collision had knocked his vehicle's license plate off, however, and he was later contacted by law enforcement. During his police interview, R.K. described Hollis's shooter as a Black man in a dark blue or black hoodie who ran eastbound toward Larson Street, but he did not see the shooter cross Larson. He was unable to see the shooter's lower body because the shooter was crouched

11.

down and there were vehicles in the way, but he stated the shooter approached on the passenger side of Hollis's vehicle.

When C.N. was interviewed shortly after the shootings, she said she stepped between Hollis, whom she knew, and a tall, mixed-race man, likely with a beard, whom she referred to as "'white boy.'" She said the men were arguing about a murder 27 years ago and "'white boy'" said something to the effect of, "'You know I don't like you. You killed my cousin.'" After she returned to the patio and heard what she thought were fireworks, she saw Hollis walk by, enter his vehicle, and strike another vehicle twice on his way out of the parking lot.

At trial, C.N. testified with obvious reluctance, but she admitted that she knew Hollis from school and that R.K. pulled her down to the ground for her safety at one point. However, she stated she did not know why R.K. pulled her down, she insisted she did not see or hear anything that night and when questioned regarding her prior statement to law enforcement, she denied making the statements attributed to her.

### D. I.P. and R.O.

Friends I.P. and R.O. were at the bar that night, along with I.P.'s wife. They were outside at a table in the enclosed patio when I.P. heard multiple gunshots coming from the front of the bar on Larson Street. I.P. thought they were fireworks at first, but he and R.O. saw a large man with a gun in his hand walk by from the front of the bar, get in his vehicle, and back out. Someone who had been crouched down then "hopped out and just, pointblank, started firing at the driver's side." The man in the vehicle hit another vehicle before driving out of the parking lot, and the shooter ran east toward Larson Street.

I.P. testified the shooter was wearing a plain black hoodie pulled up over his head and jeans, but he did not see the shooter's face. He spoke with police more than once and he recalled telling them that the shooter was Black, but he said he also told them that the shooter could have been wearing black gloves. During his police interview, I.P. said the shooter was wearing "jean short, uh, jean pants."

12.

R.O. could not tell where the shooter came from, but he thought it was from the direction of Larson Street. He did not see the shooter's face or recall seeing him earlier at the bar, but the shooter was wearing a plain, dark sweatshirt with the hood pulled up and R.O. saw something white, but he was unsure whether it was from the shooter's socks or shoes. The black sweatshirt he viewed in court was similar to what he saw that night, but he was unsure about the shoes. R.O. told police that he did not know the race of the shooter and first stated the shooter wore a black-hooded sweatshirt, jeans or shorts, and white shoes. He later stated that the shooter appeared to be wearing blue jean-type shorts.

### E. Video Surveillance Footage

The bar had eight operating surveillance cameras, but none captured Tomlin's shooting in front of the bar or Hollis's shooting in the parking lot. However, the footage showed defendant, Cannon, Richards, and Tomlin together at the bar that night, and it showed several interactions with Hollis. Defendant was wearing a dark beanie with white writing on it, a dark-hooded sweatshirt, shorts and athletic shoes, and Cannon was wearing a white baseball cap that glowed distinctively on the camera footage.

At approximately 12:50 a.m., footage from inside the bar and from the enclosed outdoor patio, which lacks audio, shows patrons react to something and flee. Hollis is visible through the security bars around the patio walking from the area in the front of the bar toward the bar's parking lot. Approximately 10 seconds later, a shadowy figure moves quickly past the patio from the front of the bar toward the bar's parking lot. The white in his shoes stands out noticeably. Approximately 10 seconds after that, a man who appears to be Cannon based on body size, clothing and glowing baseball cap is visible through the patio's bar walking from the front of the bar in the direction of the bar's parking lot and then back toward the front of the bar.

## IV. Gang Evidence

### A. Background

Relevant to the murder charge, the gang enhancements and the gang special-circumstance allegation under section 190.2, subdivision (a)(22), the prosecutor's theory was that defendant and Tomlin were active participants in CBC at the time of the shooting, and after Hollis, a rival East Side Crips (ESC) gang affiliate, gunned down Tomlin, defendant avenged Tomlin's death in adherence with gang code. The prosecution's gang expert, BPD Detective Robert Pair, testified that during his 17-year career, he was primarily assigned to the east side of Bakersfield, which included CBC and ESC gang territory, and the majority of his experience related to the CBC, ESC, West Side Crips (WSC), and Bloods gangs.

Pair testified that Crips gangs are primarily, but not exclusively, Black gangs, and at the time of trial, he estimated there were approximately 100 active CBC members and at least 300 active ESC members. CBC claims the territory bordered by East Belle Terrace to the north, East White Lane to the south, Cottonwood Road to the east, and Union Avenue to the west; and ESC claims the territory directly north, bordered by East California Avenue to the north, East Belle Terrace to the south, Mount Vernon Avenue to the east, and Union Avenue to the west. CBC and ESC are rivals, and CBC aligns with WSC, which claims territory west of Union Avenue.

CBC's primary activities are narcotic sales, weapons violations, burglary, auto theft, and murder; its gang color is powder blue; it identifies with the North Carolina Tar Heels (N-C) sports team; and it frequently uses graffiti "as a visual indicator." Gang-related acronyms include CBC, ESK, and WSK, as well as 1400 for the 1400 block of Reese Avenue and 700 for the 700 block of Watts Drive, which Pair described as areas of historical significance for CBC. Although also legitimate businesses, historical hangouts for CBC include Watts Market at Watts Drive and Lotus Lane, and Hollywood Market at Planz Road and Shellmacher Avenue. "Hood Day," which Pair's testimony indicates is

14.

an annual day of celebration for gangs, is March 23 for CBC because the numbers 3-2-3 correspond with the alphabetical order of the letters C-B-C.

Pair described CBC as an umbrella gang that includes subsets based on streets or geographic areas, and said it is the most structured of the Crips gangs. Examples of subsets include Notorious Country, Neighborhood Country, Watts and Locust, Reese and Cheatham, and Mad-Block for Madison Avenue. He also described CBC as "more insular[,]" "tight-knit," "unified," and "family based" than other Crips subsets, and stated its mottos include "'south, love, and loyalty.'" Pair stated members usually exit CBC at death, and although he acknowledged that some occasionally either simply leave or age out, those are difficult avenues of exit from the gang if the individual remains in the same environment with the same people.

### B.    Predicate Offenses

For the purpose of demonstrating that CBC is a criminal street gang involved in a pattern of criminal gang activity, the prosecution offered evidence of six predicate offenses, two of which involved defendant.  (§ 186.22, subd. (e).)[12]

#### 1.    D'Vontae Pink

In February 2013, D'Vontae Pink, a CBC known as Fido, committed a series of shootings in ESC territory. During one incident, Pink and Jimmy Baker drove by a market frequented by ESC members and opened fire, killing one person. Several weeks later, another shooting occurred. In connection with the shootings, Pink was convicted of murder, aggravated assault, shooting at an inhabited dwelling, being a gang member in possession of a firearm, gang participation, and discharging a firearm from a vehicle.

---

**12**     Under the gang statute, "'pattern of criminal gang activity' means that gang members have, within a certain time frame, committed or attempted to commit 'two or more' of specified criminal offenses (so-called 'predicate offenses')." (*People v. Gardeley* (1996) 14 Cal.4th 605, 610, disapproved on another ground by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13 (*Sanchez*).

Pink had two tattoos that Detective Pair found significant: "N-C" on his arm for the North Carolina Tar Heels and "187" on his forehead, which is the Penal Code section for murder and was added by Pink sometime after his arrest. Pair also identified Pink and defendant together in a Facebook photograph that was captioned "'my two H-blocc.'" Prior testimony by defendant's sister established that the photo of Pink and defendant was posted to her Facebook page on March 18, 2018, at the same time she had a scheduled visit with Pink. However, she denied taking the photo or posting it, she stated Hacienda is the street she grew up on, and she denied there was any significance to the spelling of "blocc," stating, "[T]hat's just how I wrote it[]" and "I spell it how I want to spell it."[13]

### 2. Adolphus Newell

In 2014, officers were monitoring a large gathering and when they approached Adolphus Newell, who was under the age of 21 and "wearing a shirt with a lot of gang related writing on it[,]" Newell ran and threw a gun. Officers recovered the gun and subsequently located Newell at his residence. Officers also seized a shirt that read "S-S," "free Jimmy Baker," "CBC[,]" "ESK" for East Side Killer, "LVK" for Lakeview Killer, "SBK" for Stroller Boy Killer, and "SGK" for Spoonie G Killer, and also included two dollar signs and several other acronyms that were not explained in testimony. Newell, an active CBC participant, was convicted of carrying a loaded firearm in public and gang participation.

### 3. Paul Timberlake

On November 7, 2014, Paul Timberlake, an active CBC participant, was at a bar with other CBC gang members. Lionel McGee, who was a gang rival, showed up at the

---

**13** Discussed *post,* the prosecution introduced evidence that the gang substitutes "c-c" for "c-k" in words because "c" and "k" together denote Crips killer, something CBC, as a Crips gang, avoided.

bar with his girlfriend and got into a verbal altercation with Timberlake. Timberlake shot McGee to death and was subsequently convicted of murder, gang and firearm charges.

### 4.    Kevin Vaughn

On April 22, 2016, officers executed a search warrant for the residence of Kevin Vaughn, who had assaulted an officer the day before. They located two firearms and a large quantity of drugs at the residence. Vaughn, an active participant in CBC, was convicted of two counts of being a felon in possession of a firearm, gang participation and two counts of possessing a controlled substance for sales.

### 5.    Defendant

On April 30, 2012, Deputy Vorhees with the Kern County Sheriff's Department (KCSD) responded to a report of a possible burglary in progress. When he arrived at the address, witnesses pointed west to a different house, where he saw two Black men entering the back of a residence. After waiting for backup to arrive and ordering the men to come out, Vorhees and other deputies entered the residence. Vorhees located defendant hiding in a closet under a blanket and his partner located Tyrone Lee hiding in the attic. Following defendant's and Lee's arrests, Vorhees returned to the residence identified in the call for service. Defendant and Lee were identified by a witness there, and Vorhees located a shoeprint on the door that matched a shoeprint at the residence where defendant and Lee were found hiding. Defendant, whom Pair opined was an active CBC participant at the time, was convicted of residential burglary.

Finally, on February 15, 2016, Detective Garrett assisted other officers during a traffic stop. The driver was Jacob Ray and defendant was sitting in the front passenger seat. A partially open backpack containing a semiautomatic handgun was in the middle of the back seat. Defendant, whom Pair opined was an active CBC participant at the time, was subsequently convicted of being a felon in possession of a firearm.

17.

### C. Other Gang-related Contacts

On July 17, 2010, KCSD Deputy Colbert, along with BPD officers, monitored a party following the funeral for Traveon Avila, who was shot and killed by BPD. The party was in the cul-de-sac where Avila, known as Kidd, was shot and Colbert stopped several vehicles leaving the area, either for traffic violations or because the individuals were subject to search conditions. During those stops, Colbert had contact with various CBC gang members, including Donnell Robinson and Tyrone James. Robinson was wearing powder blue shorts and a T-shirt memorializing Avila, which read something to the effect of "'south in peace[.]'" During Robinson's search, Colbert found a camera with a memory card containing photographs from the funeral, including some with gang members, and a video with Robinson rapping about the funeral and Avila's passing. The video, which contained derogatory statements about BPD (hereinafter 2010 BPD video), also featured Tyrone James.

Lieutenant Stratton, who was an officer with the gang unit at that time, subsequently viewed the 2010 BPD video Colbert found on Robinson's camera. Stratton had multiple prior contacts with defendant and testified he was able to tell defendant apart from his twin brother even though they looked similar and dressed similarly. Stratton identified defendant in the video; he was throwing gang hand signs for CBC and "SS for South Side Country Boy[,]" and he said, "'fuck Stratton[.]'"

On May 29, 2011, defendant and three other men were contacted by law enforcement in the public parking lot of a convenience store. Defendant admitted he was a member of CBC.

During the search of a residence on February 20, 2013, law enforcement located a letter authored by defendant in one of the bedrooms. Detective Pair testified to the contents of the letter and stated he found it significant that throughout the letter, a single "S" was replaced with "two S's" for South Side, a CBC reference; the letter "E" was replaced with the number 3; and "C-K" was replaced with "C-C." The letter also

18.

contained R.I.P. and a series of nicknames, some of which were familiar to Pair, and it concluded with "'lov[3] you, bro[.]'"

Defendant and Pink lived on the same street within one block of one another, and on October 3, 2013, Officer Malley contacted defendant as he was on the front lawn of Pink's residence walking away. Malley inquired about defendant's wrist tattoos, described as tombstones with monikers on them. Defendant told Malley he was a CBC and his homeboys' names were on the tombstones. The monikers included Ant, Q Locc and Kidd, and defendant told Malley that Kidd was a CBC who was shot and killed by BPD. Malley knew Kidd to be Traveon Avila.

Detective Pair later testified that defendant also has ESK (East Side Killer) and LVK (Lakeview Killer) tattoos; and that with respect to defendant's in memoriam tattoos, Ant referred to Anthony Daniels, who was in CBC, and although Pair did not know who Baby V and Fido 3 were, their nicknames evidenced the gang's "sponsor[ship]" practice where more senior members add less senior members to their nicknames. Pair explained that this is done by the addition of "big," "little," "baby," "tiny[,]" or numbers to a more senior member's nickname; and he knew Baby V was someone under Vanis Anthony's structure and Fido 3 was someone under Pink's structure.

On November 21, 2013, Malley was involved in the search of a bedroom defendant purportedly shared with his two brothers. Malley located paperwork belonging to defendant, and he took photographs, which were shown to the jury. One photograph showed a tribute shirt with a picture of Avila against a powder blue background and the phrase "'in loving memory'" or "'in love and memory[,]'" as well as a photograph of a CBC meeting in front of a house within the gang's territory. Other photographs showed "'R.I.P. Ant[]'" written by someone on the trim around the closet, and a funeral pamphlet and a birthday card on the wall. The birthday card, which was not addressed to anyone, had a Watts and Locus street sign, the letters "S-S" and "N-C," "Burr[,]" and "'Happy C-Day Locc'" written on it. There were only two beds in the room and items were

strewn throughout the room, leading Malley to doubt that three people slept there full-time.

Defendant and his twin brother were contacted by law enforcement during a traffic stop on March 18, 2014. Defendant's brother had a mohawk haircut with "CB" shaved in the back, and defendant was wearing powder blue clothing and shoes.

On May 3, 2015, Officer Montgomery responded to Hollywood Market. Defendant and another man were standing across the street in a dirt field by a tree stump. Three other men walked away as Montgomery approached. Montgomery located a firearm approximately 10 feet from where defendant and the man were standing, and he located footprints within two to three feet of the firearm that matched the shoes defendant was wearing. No charges were filed, however.

Between December 12, 2015, and January 1, 2016, Detective Garrett, then an officer, viewed a Facebook account under the name of Ssub Zxro, which he knew to be associated with Jacob Ray. Garrett took a photograph of a four-picture collage posted on December 29, 2015. In one of the photographs, defendant was in a black shirt with a blue, airbrushed "H-B" on it for Hacienda Block. The shirt also had on it "ESK" for East Side Killer; "SGK[]" for Spoonie G Killer; "LVK[]" for Lakeview Killer; "MCK" for Mid-City Killer; "CBC[]" for Country Boy Crips; "S[]" for South, which is also associated with CBC; and "'dicc fuck Raggz dead[.]'" Garrett testified that Raggz was Lionel McGee, a notable ESC member killed by Timberlake in 2014, and that "'dicc'" means "[d]ick," but Crips avoid writing "C" and "K" together because it means Crips killer. In the photograph, defendant was forming the letter "H" with his hand above the "H-B" on his shirt and Jacob Ray was on his right wearing a powder blue shirt, a backwards hat and a bandana around his mouth.

During a contact on January 10, 2016, at Hollywood Market, Officer Jeffries asked if defendant was still an active CBC member. Defendant replied, "'[Y]eah, but I don't do much anymore.'" He also stated that he had been a member for "'a long time.'"

20.

On May 3, 2016, Officer McIntyre contacted defendant at his residence and gave him a letter from "Bakersfield Safe Streets Partnership," which is an outreach program by BPD and local churches. Defendant asked why he needed the program and McIntyre told him that unless he was no longer a CBC, he probably needed to go. Defendant responded, "'Well, I'll never change, but I'll go.'"

Finally, the prosecutor introduced two photographs of defendant and Hassan Rogers that were uploaded to a Facebook page on March 30, 2018. In one, Rogers was making a sign for Watts and Lotus with his right hand and defendant was making an "H" with his hand. Pair testified he knew Rogers to be a CBC, and he noted that the two were in custody together following defendant's arrest in this case.

### D.    Video Evidence

The prosecution introduced four gang-related rap videos into evidence, one of which was on the memory card Deputy Colbert seized from Donnell Robinson and three of which were downloaded from YouTube by Detective Pair. The 2010 BPD video seized by Colbert and described by Lieutenant Stratton *ante*, was made shortly after the death of Traveon Avila, who was shot by police. Detective Pair testified that the lyrics, which centered around "'fuck BPD[,]'" were not of great value to him with respect to evaluating gang activity because people were understandably upset about the shooting. However, the prevalence of CBC gang hand signs throughout the video; and defendant's shirt, hand signs, and call out to a specific BPD officer (Stratton) were significant in the context of evaluating defendant's gang involvement.

In the first YouTube video, entitled "S-One Country Til Death[,]" Pair identified Tomlin as a participant and he also recognized Tyrone Lee, who was arrested with defendant in 2012 for burglary. Pair explained that the "Watts 700 ESK[]" T-shirt worn by several other participants signified the 700 block of Watts Drive, which is in CBC territory, and ESK, or East Side Killer, signaled disrespect for CBC's rival. Multiple participants were throwing gang signs, including "W" and "L" for Watts and Lotus and

21.

"C-W[]" for Cottonwood, and the video featured the empty field across from Hollywood Market and shots of Watts, Lotus, Planz and Shellmacher street signs. The prosecutor highlighted the lyrics, "You gotta know your history[,]" and "I'm in the field where the soldiers be[]"; and Pair explained that CBC "is deep on history" and in an ongoing war with ESC.

In the second YouTube video, entitled "Lu Kane O.B.L.[,]" numerous participants were wearing powder blue and the video featured shots of Tomlin, Watts Market, the cul-de-sac where Avila died, and a cross in memory of Avila. "S.I.P." was visible on a building in some of the cul-de-sac shots, and Pair explained that "south in peace" and "rest in peace" are used interchangeably. Pair identified numerous participants in the video, and he explained that the lyrics, "[W]hy ya'll run your mouth like we ain't got guns[,]" and "Like we gonna cross Belle Terrace with them hot ones[,]" referred to "somebody talking … crap." He also explained that Belle Terrace borders ESC territory and he opined that "hot ones" referred to guns.

The third YouTube video, entitled "Ryda's (S.I.P. GLOCC)," was uploaded to YouTube on March 5, 2018, and Pair described it as a tribute video to Tomlin (hereinafter tribute video). Tomlin was featured in various shots, including at Hollywood Market, and Pair also recognized Donnell Robinson and Tyrone James in the video. The prosecutor highlighted the line, "[T]rouble packing two Glock nines for my … Hubba Bubba[,]" and Pair explained that Tomlin's nickname was GLOCC 99, meaning double, or two, Glock .9-millimeter guns. The prosecutor also highlighted the phrase, "Catch ya slippin[,]'" and Pair opined it meant to catch someone unaware, in this context a "rival … so that something violent can happen." With respect to the word "ryda," Pair explained that CBC avoids the use of the letter E due to its association with ESC and will instead write the word a different way, replace the letter E with the number 3, or cross out the E.

### E. Defendant's, Tomlin's and Hollis's Gang Affiliation

During his trial testimony, Cannon stated that he used to affiliate with CBC, but that was 10 or 15 years ago. There was no other evidence introduced linking Cannon to a gang, and there was no evidence linking Richards to a gang. However, based on a totality of the circumstances, Pair opined that at the time of the shooting on January 6, 2018, Tomlin and defendant were active CBC participants. With respect to defendant, Pair based his opinion on the gang contacts, the 2010 BPD video related to Avila's death, photographs, and tattoos, previously summarized.

Pair opined that Tomlin was an "original gangster" or "O.G." who had clout and was respected within CBC. In forming this opinion, Pair relied on Tomlin's level of participation in the three CBC-related rap videos, one of which was a tribute to Tomlin uploaded after his death. Tomlin was not merely a background participant in the videos, and Pair explained that this level of participation would not be afforded someone who was merely a family member or who merely hung out, nor would a nonmember receive a "S.I.P" tribute video. Additionally, Tomlin had one ESK tattoo, and three photographs obtained from his cell phone were introduced at trial. One photograph included Tomlin's nickname, GLOCC 99 with a "C" in place of the "K"; another showed Tomlin making a hand sign for "Feliz[]" while standing next to a man making what appeared to be a Watts and Lotus hand sign; and the third showed Tomlin with Donnell Robinson aka Diggz and Gregory Miller, both of whom Pair was familiar with based on his investigation into CBC.

Regarding Hollis, Pair testified that "historical data points towards" ESC membership "at one point[,]" but "a lot of that information [was] extremely dated." Pair opined that Hollis had some affiliation with ESC, but Pair did not have enough recent information to conclude that Hollis was an active gang member.

23.

## F. Hypothetical

Finally, Detective Pair testified that when a CBC member is attacked, the expectation is that fellow gang members will jump in and a failure to act will result in discipline, including but not limited to fighting one or more fellow gang members. The prosecutor then asked Pair the following hypothetical question: "A well-known Country Boy Crip[s] gang member is shot down in front of a local bar by a rival gang member from the East Side Crips. The rival East Side Crip[s] gang member walks to his nearby vehicle and begins to leave. As he is leaving, another Country Boy Crip[s] gang member runs up next to the vehicle, fires multiple rounds into it. The East Side Crip[s] gang member drives off, but crashes nearby where he is found deceased. [¶] Do you have an opinion as to whether or not that incident in the hypothetical … was for the benefit of or in association with a criminal street gang such as the Country Boy Crips?"

Pair opined the crime would be committed for the benefit of and in association with CBC. He explained, "One, there's a tit for tat. And it's referenced in some of the rap lyrics you heard that if they get one of ours, we're going to get one of theirs. So we set that to the side. There's an expectation, they get one of ours—and I'm speaking as a gang member—then we're going to get one of theirs. [¶] The second is that if somebody is a high ranking member of your organization and they're killed in front of you, and you have the means to enact vengeance or retaliation, then you're expected to. And it's just part of that lifestyle and being a gangster. And not doing that would be extremely odd behavior and probably punished. And that's even setting aside any kind of friendship or anything else. That's just straight hood rules, for lack of a better term. And that you absolutely have to jump when something happens like that."

## DISCUSSION

### I. Substantial Evidence Challenge to Gang Enhancements

#### A. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense[]" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

#### B. Background

"In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (the STEP Act). (§ 186.20 et seq.)" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047 (*Hernandez*).) "'Underlying the STEP Act was the Legislature's recognition that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." (Pen. Code, § 186.21.) The act's express purpose was "to seek the eradication of criminal activity by street gangs." [Citation.]'

25.

[Citation.] In pursuit of this goal, the STEP Act focuses upon 'patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs.' (§ 186.21.)" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129, fn. omitted.)

Relevant here, "a defendant who commits a felony in furtherance of criminal street gang activity is subject to increased punishment." (*People v. Fuentes* (2016) 1 Cal.5th 218, 223.) The gang enhancement, codified in section 186.22, subdivision (b)(1), applies to felonies "that were (1) 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' and (2) 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 331.) "'Not every crime committed by gang members is related to a gang' for purposes of the enhancement [citation], but the enhancement applies 'when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang' [citation]." (*Ibid.*, quoting *Albillar*, *supra*, 51 Cal.4th at pp. 60, 68.)

Although gang membership is not an element of the enhancement, gang evidence can nevertheless bolster the prosecution's theory on the elements it is required to prove. (*Sanchez*, *supra*, 63 Cal.4th at pp. 698–699; *People v. Gutierrez* (2009) 45 Cal.4th 789, 820; *Hernandez*, *supra*, 33 Cal.4th at pp. 1044–1049; *People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 541.) "Gang membership is simply circumstantial evidence establishing that the crime was gang related and a motive for why a defendant may have harbored the 'specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Villa-Gomez*, *supra*, at p. 540.)

C.      Analysis

1.      Summary of Parties' Positions

Relying on *People v. Ochoa*, *People v. Ramon*, and *People v. Albarran*, defendant claims that the evidence in this case is insufficient to support either element of the gang

26.

enhancement, entitling him to reversal. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 653 (*Ochoa*) [evidence insufficient to support gang enhancement where the defendant acted alone when he demanded the victim's vehicle at gunpoint, and he was not wearing gang colors, did not flash any gang signs, and did not make any gang-related statements]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 853 [presence of two gang members in gang territory in stolen truck with unregistered firearm insufficient to support gang enhancement, at least where gang expert did not identify possession of stolen vehicles as a primary activity of the gang]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 217 (*Albarran*) [trial court reversed gang enhancements for insufficient evidence, but its error in admitting "extremely prejudicial gang evidence" also entitled the defendant to retrial on all charges]; see *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [a minor's "criminal history and gang affiliations cannot solely support a finding that a crime is gang-related under section 186.22."].) Defendant points to the absence of any evidence that the crimes committed were gang related, other than defendant's and Tomlin's shared gang affiliation. The People respond that the jury could have reasonably inferred that Hollis was affiliated with ESC and the circumstances surrounding the crimes, namely that defendant shot a rival gang affiliate after that affiliate shot a respected member of defendant's gang, are sufficient to uphold the gang enhancement findings. For the reasons set forth below, we agree with defendant and reverse the gang enhancements attached to counts 1 through 3.

### 2. Gang Membership and Commission of Crime Insufficient

"Gang membership, standing alone, is not a crime[]" (*People v. Elizalde* (2015) 61 Cal.4th 523, 539), and "[a] gang [finding] cannot be sustained based solely on [a] defendant's status as a member of the gang and his subsequent commission of crimes[]" (*Ochoa*, *supra*, 179 Cal.App.4th at p. 663; accord, *People v. Rios* (2013) 222 Cal.App.4th 542, 573–574 (*Rios*); *In re Frank S.*, *supra*, 141 Cal.App.4th at p. 1199). However, "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only

27.

permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement[]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048, quoting *Albillar*, *supra*, 51 Cal.4th at p. 63; accord, *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367–1368), and "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members[]" (*Albillar*, *supra*, at p. 68; accord, *People v. Franklin* (2016) 248 Cal.App.4th 938, 949 (*Franklin*); *Rios*, *supra*, at pp. 573–574). "[T]he typical close case[, therefore,] is one in which one gang member, acting alone, commits a crime." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; accord, *Rios*, *supra*, at p. 574.)

The crimes in this case did not involve any of the more common hallmarks of gang-relatedness: the crimes were not committed in gang territory or at a location associated with gang activity, none of the involved parties wore any gang clothing or colors, no gang slurs or gang hand signs were used, there was no evidence that defendant knew Hollis or knew that he had a past or present association with ESC, and there was no evidence that defendant committed the crimes with other gang members or in the presence of other gang members. The absence of these factors is not necessarily fatal to a gang-enhancement finding, and we are mindful of Detective Pair's testimony that gang members are rarely "suited and booted head to toe in a particular gang color anymore[]" unless it is Hood Day. Nevertheless, the prosecution must demonstrate more than defendant's gang membership, his commission of a crime, and a broad theory that he acted in accordance with general gang culture; and the "'hypothetical question [relied on] must be rooted in facts shown by the evidence.' [Citation.] Indeed, an 'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors."'" (*Franklin*, *supra*, 248 Cal.App.4th at p. 949, citing *People v. Richardson* (2008) 43 Cal.4th 959, 1008 & *People v. Gardeley*, *supra*, 14

28.

Cal.4th at p. 618; see *In re B.J.* (2020) 49 Cal.App.5th 646, 651 [carjacking of higher-end vehicle in gang territory on Hood Day sufficient to support gang enhancement where expert explained the crime's financial benefit to the gang and the significance of younger gang members committing crimes on Hood Day].)

### a. Showing Strength and Instilling Fear in Community

On appeal, the People argue that the jury could have reasonably concluded that Hollis's shooting "was intended to demonstrate the strength and cohesiveness of the [CBC] and to promote fear in the community through a swift, violent and vengeful act." Neither the prosecutor's hypothetical question nor Pair's response to it involved benefit to a gang through a show of strength or instilling fear in the community. This is telling. We agree with the People that either theory might suffice to demonstrate a benefit to a criminal street gang in a given case. Here, however, there was nothing about the circumstances of the crimes that would have alerted members of the community, either at the bar that night or at large, that the crimes were committed by a gang member or were otherwise gang related. As such, the record is devoid of any basis for reasonably inferring that the crimes benefited CBC through a show of strength or by instilling fear in the community. (*People v. Perez* (2017) 18 Cal.App.5th 598, 613–614; *Rios, supra*, 222 Cal.App.4th at p. 574; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363–1364; *Ochoa, supra*, 179 Cal.App.4th at p. 663.)

### b. Retaliatory Killing of a Gang Rival

The People also argue that defendant shot Hollis because he was a rival gang member and that the jury could reasonably infer defendant's knowledge of Hollis's ESC affiliation from Pair's testimony. We are unpersuaded. Pair opined that Hollis "had some affiliation to the [ESC,]" based on "historical data[,]" "a lot [of which was] extremely dated[,]" but which pointed toward ESC membership at one point. Pair noted that Hollis's most recent interactions with law enforcement were in 2009 and again in 2016, but the nature of those contacts was not specified and the record is devoid of any

29.

evidence from which it may be inferred that the interactions were at all related to ESC. At best, Pair's testimony shows that Hollis, who was 52 years old at the time of his death, had some past link to ESC, but it does not support a reasonable inference that Hollis was an affiliate or member of ESC at the time of his death, and, furthermore, there is no evidence that defendant, who was only 24 years old, knew Hollis prior to the night of the crime or considered Hollis a gang rival.

The People contend that it was reasonable for the jury to infer a gang rivalry between defendant and Hollis because CBC and ESC share a territorial boundary; defendant and Cannon were CBC members; and defendant was at the bar at the same time as Cannon and Hollis, who had a shared history. The People's position is untenable. In addition to the absence of any evidence defining Hollis's relationship with ESC at the time of the crime, Pair also testified that ESC has *at least* 300 active members, probably significantly more; and while the size of the gang's respective territories was never defined, it bears mention that Bakersfield is a sizeable city rather than a small town. Evidence that CBC claims territory south of East Belle Terrace and ESC claims territory north of East Belle Terrace, without more, does not support a reasonable inference that defendant would have known Hollis and known he was affiliated with ESC.

Regarding Cannon's status, although defendant committed the crimes alone, he was at the bar with others and we recognize there is no entitlement in gang cases to a presumption that family or friendship ties predominate over gang ties. (*Albillar*, *supra*, 51 Cal.4th at p. 62; accord, *People v. Weddington* (2016) 246 Cal.App.4th 468, 484.) However, at 46 years old, Cannon was more than 20 years older than defendant and while the jury was not required to believe Cannon's testimony that he was merely acquainted with defendant from seeing him around the neighborhood, there was no evidence of a closer relationship. Nor did Pair or any other law enforcement officer offer an opinion as to Cannon's—or Richards's—gang involvement, past or present. This leaves only Cannon's testimony that while he used to affiliate with CBC, he gave up gang life 10 or

15 years ago when he grew up and started working, at which time defendant was still a child. As such, the People's assertion that defendant and Cannon were linked by a shared gang membership is purely speculative.

Finally, support for the People's position that defendant sought to avenge Tomlin's death because of his stature within the gang is tenuous. Viewed in the light most favorable to the prosecution, both men were affiliated with CBC at the time of Tomlin's death, Tomlin occupied a position of respect in the gang, and the two socialized that night at the bar. However, Tomlin did not appear with defendant in the 2010 BPD video filmed after Avila's funeral, defendant did not appear in any of the three YouTube videos offered to establish Tomlin's heightened stature in the gang, and with the exception of the night of the crime, Pair did not review any information linking defendant and Tomlin. There was also no evidence supporting a reasonable inference that all CBC members know one another. To the contrary, Pair stated that CBC members further identify with subsets based on their neighborhoods, but he did not know which subset, if any, either defendant or Tomlin claimed. It may well be that defendant knew Tomlin was a respected OG in CBC, but there must be evidence offered at trial that would allow a reasonable trier of fact to draw that inference; here the evidence falls short. (*People v. Rekte* (2015) 232 Cal.App.4th 1237, 1247 ["A reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence."].)

### 3. *Hill*, *Vazquez*, and *Margarejo* Cases

The People cite *People v. Hill* (2006) 142 Cal.App.4th 770 (*Hill*) for the proposition that commission of crimes by a lone gang member will satisfy the specific intent prong of the enhancement where the gang member intends to promote and further his own gang-related criminal conduct, and *People v. Vazquez* (2009) 178 Cal.App.4th 347 (*Vazquez*) and *People v. Margarejo* (2008) 162 Cal.App.4th 102 (*Margarejo*) for the

31.

proposition that gangs are benefitted by crimes that elevate their status and intimidate the community at large. We agree with the People that being a lone actor does not necessarily foreclose the jury from finding defendant's crimes were gang related, and that both demanding respect and intimidating the community can benefit criminal street gangs. Indeed, the prosecutor's theory in this case was plausible, but the deficiency lies with the absence of facts in evidence supporting that theory, and the cases the People cite for support are readily distinguishable.

In *Hill*, the defendant was convicted of making a criminal threat with an attached gang enhancement. (*Hill*, *supra*, 142 Cal.App.4th at p. 772.) Although the defendant acted alone following a traffic collision with the victim, he accused the victim of disrespecting him and specifically referred to his gang by name when he did so. (*Ibid.*) He later returned to the scene with his girlfriend, they both accused the victim of disrespecting him and threatened her, he touched the gun in his waistband, and he demanded the victim fight his girlfriend. (*Ibid.*) The gang expert testified regarding the issue of gangs and perceived disrespect, and, on appeal, the defendant did not challenge the jury's determination that he made the threat for the benefit of the gang to which he belonged. (*Id.* at pp. 772–773.) Rather, he claimed, unsuccessfully, that the Court of Appeal should follow decisions from the Ninth Circuit Court of Appeals requiring that "the crime [charged in the case] be committed to enable or further *other* criminal activity by the gang." (*Id.* at p. 773.)[14]

In *Margarejo*, the defendant was convicted of evading police, being a felon in possession of a firearm, and concealing a firearm in a vehicle, with attached gang

---

[14]    The California Supreme Court subsequently rejected the Ninth Circuit's interpretation of the gang statute and agreed that "'[t]here is no statutory requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.'" (*Albillar*, *supra*, 51 Cal.4th at p. 66, quoting *Vazquez*, *supra*, 178 Cal.App.4th at p. 354 and citing *Hill*, *supra*, 142 Cal.App.4th at p. 774.)

enhancements. (*Margarejo*, *supra*, 162 Cal.App.4th at p. 104.) The defendant ran a stop sign and then led police on an almost 20-minute vehicle chase, throughout which he flashed his gang's hand sign at police, pedestrians and other vehicles. (*Id.* at pp. 105–106.) After stopping his car, the defendant fled on foot into an apartment unit where his good friend and fellow gang member lived, and he stashed his firearm in his friend's safe. (*Id.* at p. 106.) Although he admitted his conduct could support a finding that he intended to intimidate the public, he claimed the evidence was insufficient to support the specific intent prong of the gang enhancement. (*Id.* at p. 110.) The Court of Appeal disagreed, concluding that the defendant's "uncommon[]" conduct during the highspeed chase (*id.* at p. 109), which served solely to broadcast a gang message, was sufficient to support the jury's finding on the specific intent element (*id.* at p. 110).

Finally, in *Vazquez*, the defendant shot and killed a man who, with his girlfriend, had parked in an alley behind an apartment complex. (*Vazquez*, *supra*, 178 Cal.App.4th at pp. 349–350.) The gang expert opined that the crime was committed for the benefit of the defendant's criminal street gang because it earned the shooter and his gang greater respect and increased status by creating an atmosphere of fear and intimidation. (*Id.* at p. 351.) In that case, however, the defendant was with two other gang members who encouraged him to shoot the victim, they fled the scene together, other gang members and associates assisted the defendant in evading arrest, the crime occurred in an alley filled with gang graffiti in territory claimed by three rival gangs, the victim was standing near a rival gang's graffiti that had been defaced by graffiti from the defendant's gang, and the defendant may have mistaken the victim for a rival gang member based on the victim's hairstyle and clothing. (*Id.* at p. 354.)

The defendant did not challenge the finding that he committed the crime for the benefit of his gang, but he claimed there was insufficient evidence of the requisite specific intent to promote *other* criminal activity by gang members. (*Vazquez*, *supra*, 178 Cal.App.4th at p. 353.) *Vazquez*, like *Hill,* was decided prior to California Supreme

33.

Court's rejection of that specific argument in *Albillar*, but the Court of Appeal was not persuaded by the Ninth Circuit's view and concluded that given the circumstances surrounding the crime, the specific intent prong was supported by substantial evidence. (*Vazquez*, *supra*, at p. 353.)

For the reasons discussed, we find the evidence in the record insufficient to support the jury's findings that defendant murdered Hollis, shot at an occupied vehicle, and possessed a firearm in association with or for the benefit of CBC, and that defendant acted with the specific intent to promote, further, or assist in criminal conduct by gang members. Accordingly, we reverse the gang enhancements and remand the matter for resentencing.

## II.     Denial of Motion to Bifurcate Gang Enhancements

Next, defendant claims that the trial court erred by denying his pretrial motion to bifurcate the gang enhancements from the substantive charges and that the failure to bifurcate the enhancements rendered his trial fundamentally unfair, in violation of his right to due process. We agree with the People that the trial court did not exceed the bounds of its broad discretion when it denied the bifurcation motion and defendant's trial was not fundamentally unfair.

### A.     Legal Standard

"Bifurcation of gang allegations is appropriate where the gang evidence is 'so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt.' [Citation.] In a case not involving imposition of the gang enhancement, such 'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.' [Citation.] On the other hand, 'evidence of gang membership is often relevant to, and admissible regarding, the charged offense.' [Citation.] Given the public policy preference for the efficiency of a unitary trial, a court's discretion to deny bifurcation of a gang allegation is broader than its discretion to admit gang evidence in a case with no

34.

gang allegation. [Citation.] Thus, '[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself … a court may still deny bifurcation.'" (*Franklin*, *supra*, 248 Cal.App.4th at p. 952, quoting *Hernandez*, *supra*, 33 Cal.4th at pp. 1049–1050; accord, *People v. Pettie* (2017) 16 Cal.App.5th 23, 43; *People v. Garcia*, *supra*, 244 Cal.App.4th at p. 1357.)

"We review the trial court's denial of the motion to bifurcate for abuse of discretion, based on the record as it stood at the time of the ruling." (*Franklin*, *supra*, 248 Cal.App.4th at p. 952, citing *Hernandez*, *supr*a, 33 Cal.4th at p. 1048.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390; *Franklin*, *supra*, at pp. 952–953.)

## B.     Analysis

"'[E]vidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative.' [Citations.] Indeed, gang evidence is 'relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.' [Citation.] '"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence."'" (*Franklin*, *supra*, 248 Cal.App.4th at p. 953.)

Defendant concedes the gang evidence was relevant to explain motive and his actions, and that it had some relevance to the shooter's identity, but he argues that the "gang evidence was not necessary to explain senseless violence[,]" and "Hollis's murder was readily explainable [because] he had just shot and killed a man who merely punched him." The prosecution was entitled to present its theory of the case, however, and

35.

defendant's contrary view of the evidence does not control.  (*Franklin*, *supra*, 248 Cal.App.4th at p. 953; see *People v. Booker* (2011) 51 Cal.4th 141, 171 ["prosecution may present a persuasive and forceful case"]; *People v. Roberts* (1992) 2 Cal.4th 271, 299 [introduction of gang evidence unconnected to the defendant not fundamentally unfair where evidence was relevant to prosecutor's theory and provided jury with context necessary to understand theory].)

Although we have determined that the elements of the gang enhancement are not supported by substantial evidence, this finding should not be interpreted to suggest the prosecution's theory was baseless or the gang evidence was irrelevant to the substantive charges.  (*Franklin*, *supra*, 248 Cal.App.4th at p. 953.)  To the contrary, while the gang evidence did not ultimately add up to enough with respect to the gang enhancement attached to counts 1 through 3, the prosecution theory was neither implausible nor baseless viewed in the context of the evidence, and the evidence was also relevant to the substantive charges and the special-circumstance allegation.  (*Ibid.*)

Moreover, following the California Supreme Court's decision in *Sanchez* and in the absence of any stipulation between the parties, most gang cases will necessarily involve more gang evidence than did cases pre-*Sanchez*.  (*Sanchez*, *supra*, 63 Cal.4th at p. 686 ["Expert *cannot* … relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."].)  Here, there were no stipulations regarding the gang evidence and, as discussed in greater detail in the next section, the evidence was neither of minimal relevance nor "extraordinarily prejudicial[.]"  (*Hernandez*, *supra*, 33 Cal.4th at p. 1049; accord, *Franklin*, *supra*, 248 Cal.App.4th at p. 952; *People v. Garcia*, *supra*, 244 Cal.App.4th at p. 1358.)

Additionally, the jury was given the following limiting instruction:

"[Y]ou may consider evidence of gang activity only for … the limited purpose of deciding whether the defendant acted with the intent, purpose,

and knowledge … required to prove the gang related crimes, the enhancements, and the special circumstance allegation charged, or the defendant had a motive to commit the crimes charged, or the defendant acted in the heat of passion. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. [¶] You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

"We presume that the jury followed these limiting instructions, and there is nothing in this record to rebut that presumption." (*Franklin*, *supra*, 248 Cal.App.4th at p. 953.) On these grounds, we reject defendant's claims both that the trial court abused its discretion in denying his motion to bifurcate the gang enhancements, and that, even if correct at the time the ruling was made, the failure to bifurcate the gang enhancements ""'actually resulted in 'gross unfairness' amounting to a denial of due process." [Citation.]'" (*People v. Pettie*, *supra*, 16 Cal.App.5th at p. 42; accord, *United States v. Lane* (1986) 474 U.S. 438, 449; *People v. Soper* (2009) 45 Cal.4th 759, 783; cf. *Albarran*, *supra*, 149 Cal.App.4th at p. 230, fn. omitted [introduction of "extremely and uniquely inflammatory" gang evidence that "had no legitimate purpose in [the] trial[]" rendered the trial fundamentally unfair].)

## III. Admission of Rap Videos and Predicate Offenses Involving Defendant

Pursuant to Evidence Code section 352, defendant challenges the amount of gang evidence admitted, specifically the number of gang rap videos and predicate offenses. He argues that the tribute video to Tomlin was sufficient to demonstrate Tomlin's position of respect in the gang, but the 2010 BPD video and the other two videos featuring Tomlin were only minimally relevant, and, even if relevant, were cumulative of other less inflammatory evidence of defendant's and Tomlin's gang membership. Defendant also argues that evidence of the two predicate offenses involving his prior crimes should have been excluded given the prosecutor's introduction of the four predicate offenses

involving other gang members.  As discussed below, we agree with the People that the trial court's admission of this evidence was not an abuse of discretion.

## A.     Evidence Code Section 352

Under California law, evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action[]" (Evid. Code, § 210), and all relevant evidence is admissible except as otherwise provided by statute (Evid. Code, § 351).  At issue here, Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

However, "'"[p]rejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail.  [Citation.] "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging."'  [Citation.]"  [Citation.]  [¶]  The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.'  [Citations.]  'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.  [Citation.]'  [Citation.]"  [Citation.]  In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the

38.

emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105; *People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).)

**B.      Standard of Review**

On appeal, we presume the trial court's evidentiary ruling is correct and defendant bears the burden of demonstrating error. (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140.) "The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence. [Citation.] 'The exercise of discretion is not grounds for reversal unless[, as set forth previously,] "'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. Clark* (2016) 63 Cal.4th 522, 572; accord, *People v. Johnson* (2019) 8 Cal.5th 475, 521; *People v. Jackson* (2016) 1 Cal.5th 269, 320–321.)

**C.      Analysis**

**1.      Rap Videos**

**a.      Background**

In this case, the court excluded one gang rap video, but admitted four others. One of four videos was filmed in 2010 after the funeral of Avila and included defendant, who flashed a gang hand sign and called out, "'fuck Stratton[.]'" The other three videos featured Tomlin. Defendant concedes the Tomlin tribute video was relevant to show Tomlin's status in the gang, but he argues that the 2010 BPD video and the other two videos featuring Tomlin "were merely cumulative of ample evidence that established [defendant] and Tomlin were gang members and were irrelevant since the charged crime

did not involve an inexplicable act of violence that could only be reasonably explained by gang evidence."

We agree with the People that the videos were probative of defendant's and Tomlin's active ties to CBC; Tomlin's stature in the gang; and, more generally, the existence of the gang itself in terms of numerous participants, its association with the color powder blue, the use of certain hand signs, and geographic locations with historical significance to the gang. As well, the videos were relevant to the prosecution's theory that defendant, an active CBC gang member, killed Hollis after he gunned down Tomlin, who was an older, respected CBC member, and the videos aided the prosecutor in tying the gang evidence together, as the evidence was necessarily elicited piecemeal in accordance with *Sanchez.*

We acknowledge defendant's citation to *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905 and *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1499 for support, but find reliance on those decisions misplaced given that both involved the admission of gang evidence for the limited purpose of demonstrating the bias of defense witnesses. Here, the gang evidence was relevant to the substantive charges, the gang enhancement attached to counts 1 through 3, and the gang special-circumstance allegation attached to the murder charge. Unlike evidence of prior uncharged misconduct admitted under Evidence Code section 1101, subdivision (b), to establish an *intermediary* fact, gang evidence introduced in a prosecution for a substantive gang offense or gang-related felonies "provides direct proof of several *ultimate facts* necessary to a conviction." (*Tran*, *supra*, 51 Cal.4th at p. 1048.) Therefore, the probative value of such evidence in a gang case is generally greater and its prejudicial effect generally less. (*Ibid.*)

### b.    *Coneal* Decision

We find the Court of Appeal's decision in *People v. Coneal* (2019) 41 Cal.App.5th 951 (*Coneal*), which was issued after briefing was complete in this case, helpful. In *Coneal*, the appellate court considered the admission of five gang rap videos. (*Id.* at

p. 953).  The court found "the rap videos had minimal probative value, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so[,]" and "[t]his minimal probative value was substantially outweighed by the highly prejudicial nature of the violent, inflammatory lyrics .…"  (*Id.* at pp. 953–954.)  The court concluded the admission of the videos was an abuse of discretion under Evidence Code section 352, but the error was harmless under state law and it did not render the defendant's trial fundamentally unfair, in violation of due process.  (*Coneal*, *supra*, at pp. 971–973.)

Given the potentially highly inflammatory nature of gang rap videos, we agree with the court in *Coneal* that trial courts must be cautious in evaluating such videos, particularly "where the rap lyrics are cumulative of other evidence, like screenshots, or where the probative value rests on construing the lyrics literally without a persuasive basis to do so .…"  (*Coneal*, *supra*, 41 Cal.App.5th at pp. 971–972.)  However, the concerns that informed the court's decision in *Coneal* are not present here.

The defendant in *Coneal* was a gang member who was convicted of first degree murder in the shooting death of a rival gang member.  (*Coneal*, *supra*, 41 Cal.App.5th at pp. 954–955.)  The two gangs had a longstanding, violent rivalry (*id.* at p. 954), and it appears the prosecutor initially sought to introduce 12 rap videos and an audio recording of the defendant rapping from jail (*id.* at pp. 960–963 & fn. 10).  Ultimately, eight videos and the audio recording were introduced at trial, and the defendant challenged the admission of five videos.  (*Id.* at pp. 953, 960–963.)

There was no dispute the five videos were relevant, but the appellate court agreed the videos were cumulative.  (*Coneal*, *supra*, 41 Cal.App.5th at p. 966.)  The prosecutor introduced the videos as evidence of the gang membership of the defendant and the individuals who committed the predicate offenses; as evidence of the prominence of a specific gang "'figurehead[,]'" which in turn explained the defendant's tattoo of that

41.

individual; and as evidence of the rivalry between the two gangs. (*Id.* at pp. 966–967.) However, as to each of these points, the appellate court found the probative value of the videos to be minimal given that the prosecutor introduced numerous screenshots from the videos, additional photographs, and witness testimony, including by two gang experts, that established each of these points. (*Id.* at pp. 966–967.)[15] The court concluded, "[T]here was a substantial amount of other probative evidence as to several purposes for which the People introduced the rap videos. This other evidence, including screenshots from the videos, rendered the additional probative value of the videos for these purposes minimal. In fact, the only new 'information' provided by the videos is the lyrics, and the lyrics are the problem." (*Id.* at pp. 967–968.)

The prosecutor treated the rap lyrics as literal with respect to fact and intent, which the court found problematic on that record. (*Coneal*, *supra*, 41 Cal.App.5th at p. 968.) The court explained, "We do not mean to suggest that lyrics are never probative of their literal truth[]" (*id.* at p. 969), and "[w]e do not purport to provide an exhaustive list of factors that may increase the probative value of lyrics as statements of literal fact or intent. It is sufficient that no such factors were present *here* to increase the probative value of the rap lyrics as evidence that the [gang's] primary activities were the list of felonies rapped by appellant; that appellant had or intended to kill rival gang members, catch victims by surprise, and engage in driveby shootings; or that the [gang's] rappers committed or intended to commit the various heinous crimes they rapped about[]" (*id.* at pp. 969–970, italics added). Further, the rap songs included "lyrics casually describ[ing] graphic, widespread violence[]" (*id.* at p. 970), and "misogynistic lyrics … [that] were highly inflammatory[]" (*id.* at p. 971).

---

**15**    The evidence in *Coneal* included more than 100 cumulative photographs, including more than 30 screenshots from the rap videos. (*Coneal*, *supra*, 41 Cal.App.5th at pp. 963–964.)

42.

In our view, the three videos challenged here stand in stark contrast with the five videos challenged in *Coneal*. Although *Coneal* did not purport to speak to number, it bears repeating that the prosecutor in *Coneal* introduced eight videos and a recording, while the prosecutor in this case introduced only four videos. Critically, unlike in *Coneal*, the prosecutor here did not introduce extensive testimony regarding the videos, did not also introduce multiple screenshots from the videos, and did not dwell on the lyrics as literal evidence of facts or intent. As discussed next, the videos here are neither minimally probative nor unduly cumulative.

### c. 2010 BPD Video

With respect to the 2010 BPD video, Deputy Colbert very briefly and without elaboration described seizing the video from a memory card during his search of Donnell Robinson, and he identified two individuals—Donnell Robinson and Tyrone James—in the video. The video was subsequently played in full during Lieutenant Stratton's testimony, and the prosecutor elicited specific testimony from Stratton regarding two parts in the video. As to those parts, Stratton, who was in the gang unit in 2010, identified defendant, described defendant's hand movements as consistent with CBC gang signs, and testified defendant said, "'fuck Stratton[.]'" Finally, Detective Pair testified thereafter that the video factored into his opinion that defendant was an active participant in CBC based on defendant's shirt, which memorialized Avila against a powder blue background; defendant's gang hand signs; and defendant's call out to a specific officer in the gang unit. Pair also noted in separate testimony that the video was filmed in the same cul-de-sac as featured in one of the Tomlin videos.

In total, the testimony of these three witnesses amounted to only five pages in the transcript, and while the lyrics were unquestionably profane and directed toward BPD, the prosecutor did not address them other than defendant's call out to Stratton. Detective Pair also stated that the lyrics were not of any specific value to him given that the participants were upset over the officer-involved shooting death of Avila. The video

43.

otherwise featured a large CBC-related gathering in a cul-de-sac that included women and children and did not include weapons, acts of violence, or criminal acts.

The prosecutor's theory of liability hinged on demonstrating that defendant and Tomlin were sufficiently active in the gang, and Tomlin in a position of such respect, that defendant instantly sought to avenge Tomlin's death not as a friend but as a fellow gang member. The prosecutor had other evidence of defendant's gang participation in the form of an admission from 2011, a letter from 2013, tattoos, gang-related clothing in 2014, a photograph from 2015, two admissions from 2016, and a photograph of defendant with Pink in 2018. The prosecutor also introduced evidence from a room search in 2013 and evidence of defendant's two convictions, although defendant was not the sole occupant of the bedroom and his convictions did not include gang charges.

However, in *Tran*, the California Supreme Court rejected the argument "that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence[,]" and stated, "[T]he prosecution cannot be compelled to '"present its case in the sanitized fashion suggested by the defense."'" (*Tran*, *supra*, 51 Cal.4th at p. 1049.) Thus, defendant is not entitled to a presentation of gang evidence stripped down to the barest of bones (*ibid.*), and the video was probative of the level of defendant's engagement in gang activities, the length of that engagement—2010 to 2018—and the gang's culture and associations. This is not a case where the other evidence was so substantial that the video had only minimal probative value (*Coneal*, *supra*, 41 Cal.App.5th at pp. 967–968), or where the prosecutor was toeing the line of "'over-prov[ing]'" its case (*People v. Williams* (2009) 170 Cal.App.4th 587, 610 (*Williams*). Under the circumstances here, we find no abuse of discretion in admitting the 2010 BPD video, which was probative of defendant's active participation in the gang and neither unduly inflammatory nor unduly cumulative. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 ["The mere fact the [rap] lyrics might be interpreted as reflective of a generally violent attitude could not be

said 'substantially' to outweigh their considerable probative value."]; accord, *People v. Zepeda* (2008) 167 Cal.App.4th 25, 34–35 [no abuse of discretion in admitting two gangster rap songs].)

### d.    Tomlin Videos

The trial court excluded one video featuring Tomlin.  The other three videos were offered to show that Tomlin was an active participant in CBC, despite being in his early 40's at the time of his death, and that he held a position of seniority and respect.  In addition, the prosecutor relied on the videos to demonstrate gang culture more generally, including certain geographic locations of historical importance that were discussed in the context of other gang contacts.

Tomlin was linked to CBC through one "ESK" gang tattoo; one photograph that included mention of his gang moniker, "GLOCC 99"; one photograph of him making a "Feliz[]" sign with his hand; one photograph of him with Donnell Robinson and Gregory Miller, both of whom had some association with CBC; and the three videos.[16]  Other than the videos, the evidence linking Tomlin to gang activity was not particularly strong and it did not specifically tie him to CBC.  Therefore, the three videos were highly probative of his active participation in CBC and his position of seniority, they were not cumulative of the other strong evidence, and testimony regarding the videos comprised only 16 pages of the transcript.

The rap lyrics themselves are laden with profanity and describe acts of violence, but we do not find them to be unduly inflammatory:  they are not exceptionally graphic and, with the exception of a nongraphic shooting scene in the tribute video that was excerpted from a movie, the videos do not feature weapons; they do not include any irrelevant, misogynistic acts or lyrics; and, as the People point out, they do not depict any

---

**16**    The significance of "Feliz" was not explained, but Detective Pair testified that CBC members identify with subsets based on streets or other geographic areas.

criminal acts.  (*Coneal*, *supra*, 41 Cal.App.5th at pp. 970–971; *People v. Zepeda*, *supra*, 167 Cal.App.4th at pp. 34–35; *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1373.)  Moreover, while the specific lyrics highlighted by the prosecutor included references to shootings and firearms, they were selected to show the rivalry between ESC and CBC generally, CBC's focus on its history, and the express reference to Tomlin in the tribute video.  In sum, we find the Tomlin videos had significant relevance, and defendant fails to persuade us that the probative value was substantially outweighed by the danger of undue prejudice.  (*Tran*, *supra*, 51 Cal.4th at pp. 1048–1049.)

## 2.     **Predicate Offenses**

Next, the prosecution was required to prove the existence of a "'criminal street gang'" as defined in section 186.22, subdivision (f).  In relevant part, this required the prosecution to show the commission of at least two qualifying predicate offenses for the purpose of establishing a "'pattern of gang criminal activity[.]'" (*Id.*, subd. (e).)  The prosecutor introduced evidence of six predicate offenses, two of which involved defendant.  Defendant claims evidence of his past crimes should have been excluded as cumulative and unduly prejudicial.  We disagree.

Defendant cites no authority supporting his position regarding a limit either on the number of predicate offenses or on the admission of predicate offenses in which he was involved.  In *People v. Hill* (2011) 191 Cal.App.4th 1104, 1139, the Court of Appeal rejected a similar argument.  The prosecutor in *People v. Hill* sought to introduce evidence of 10 predicate offenses and the trial court permitted eight.  (*Id.* at pp. 1137–1138.)  On review, the appellate court evaluated the admission of the eight predicate offenses through the lens of *Williams*, *supra*, 170 Cal.App.4th at pages 608–611.  (*People v. Hill*, *supra*, at p. 1139.)

In *Williams*, the trial court admitted evidence of at least eight predicate offenses and held the view that "'the [district attorney] is entitled to the full force of their evidence.  If they want to over-prove their case or put on all the evidence that they have,

46.

that's their right.'" (*Williams*, *supra*, 170 Cal.App.4th at p. 610.) The Court of Appeal stated, "We strongly disagree with the view that prosecutors have any right to 'over-prove their case or put on all the evidence that they have.'" (*Ibid.*) "[N]either the prosecution nor the defendant has a right to present cumulative evidence that creates a substantial danger of undue prejudice [citation] or that unduly consumes the court's time [citation]." (*Id.* at p. 611.) The court concluded "it was an abuse of discretion to admit cumulative evidence concerning issues not reasonably subject to dispute. The sheer volume of evidence extended the trial—and the burden on the judicial system and the jurors—beyond reasonable limits, and the endless discussions among the trial court and counsel concerning the admissibility of such evidence amounted to a virtual street brawl." (*Ibid.*)

In *People v. Hill*, the appellate court distinguished *Williams*, explaining, "We do not read *Williams* to create an artificial limit of seven (or fewer) predicate offenses to prove the gang enhancement. The trial court here exercised its discretion and eliminated two offenses the prosecution sought to introduce. This ruling created neither a 'street brawl' nor 'endless discussions.' No error occurred." (*People v. Hill*, *supra*, 191 Cal.App.4th at p. 1139; accord, *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1435–1436 [admission of six predicate offences not error].) In this case, as previously stated, the gang evidence was relevant to the substantive charges, the gang enhancements, and the gang special-circumstance allegation. The trial court evaluated the evidence; found that the predicate offenses, which occurred between 2012 and 2016, were relevant to show a pattern of criminal activity; and that as to defendant, the prior convictions did not involve "repetitive" homicides or shootings at an occupied vehicle and were less inflammatory than the charges in the case. The court concluded that the probative value outweighed any prejudicial impact. Unlike in *Williams*, the trial court here did not hold the view that the prosecution had the right "'to over-prove [its] case[,]'" and the evidence was not unduly cumulative. (*Williams*, *supra*, 170 Cal.App.4th at p. 610 [prosecutor

47.

spent almost two full days on evidence that was a repeat of previous evidence].) Accordingly, we find no error.

## IV. Admission of Photographs of Hollis's Body

Defendant claims that the trial court erred under Evidence Code section 352 when it admitted photographs showing Hollis's body inside his vehicle, and that admission of the photographs also violated his right to due process. He argues the photographs had no relevance given the absence of any dispute as to how Hollis died, and to the extent Hollis's wounds had minimal relevance, the crime scene photographs were cumulative of the autopsy photographs. We find no merit to this claim.

It is well settled that "'[a]t base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] "'[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant'" [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352). A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1282, quoting *People v. Gurule* (2002) 28 Cal.4th 557, 624; accord, *People v. Powell* (2018) 6 Cal.5th 136, 163–164.) "'To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect.'" (*People v. Lewis*, *supra*, at p. 1282, quoting *People v. Whisenhunt* (2008) 44 Cal.4th 174, 211–212; accord, *People v. Peoples* (2016) 62 Cal.4th 718, 748.)

The prosecutor introduced five photos of Hollis's body taken from different angles, but, as the trial record reflects and our review confirms, the first photo is so dark that Hollis's body is not readily discernible. Of the other four photos, none is excessively bloody and only one clearly shows a bullet wound. Although the photographs show

Hollis shot to death, we do not find them unusually gruesome and they are not unduly cumulative. Defendant's argument that the photographs are irrelevant because the circumstances of Hollis's death were not in dispute lacks force. "'Photographs of a murder victim "are always relevant to prove how the charged crime occurred, and the prosecution is 'not obliged to prove these details solely from the testimony of live witnesses,'" even in the absence of a defense challenge to particular aspects of the prosecution's case.'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 299; accord, *People v. Booker*, *supra*, 51 Cal.4th at p. 170; *People v. Lewis*, *supra*, 46 Cal.4th at p. 1282.)

Here, the prosecutor had a right to show the jury Hollis's body as it was found at the crash site and the evidence was relevant to the manner of death; what Hollis looked like and what he was wearing given the various witness accounts and surveillance camera footage introduced into evidence; to corroborate various witnesses' testimony, including that Hollis was shot through the driver's side door; and to aid the jury in evaluating witness credibility. (*People v. Morales* (2020) 10 Cal.5th 76, 103–104 ["'[P]hotographs are [not] irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate.'"]; accord, *People v. Scheid* (1997) 16 Cal.4th 1, 14–17.) We conclude the four photographs were relevant and "'are not of such a nature as to overcome the jury's rationality.'" (*People v. Lewis*, *supra*, 46 Cal.4th at p. 1282, quoting *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 212.) We find no error, and "[p]roper admission [of the photographs under state law] vitiates [the] defendant's constitutional claim." (*People v. Winbush* (2017) 2 Cal.5th 402, 458.)

## V.   Cumulative Error

Defendant claims that cumulatively, the errors committed by the trial court resulted in prejudice to him. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) We have rejected defendant's individual claims of error

and, therefore, his claim of cumulative error necessarily fails. (*People v. Williams* (2013) 56 Cal.4th 165, 201, disapproved on another ground by *People v. Elizalde*, *supra*, 61 Cal.4th at p. 538, fn. 9; *People v. Sedillo*, *supra*, at p. 1068; *People v. Leeds* (2015) 240 Cal.App.4th 822, 837.)

## VI. Senate Bill No. 1393

Finally, effective January 1, 2019, Senate Bill No. 1393 amended sections 667, former subdivision (a)(1), and 1385, former subdivision (b), and granted trial courts the discretion to strike the previously mandatory five-year prior serious felony conviction enhancement under section 667, subdivision (a)(1). The parties agree that Senate Bill No. 1393 applies retroactively to this case, but they disagree whether remand is required. The People take the position that remand would be futile because the trial court's comments and sentencing choices clearly indicate it would not have dismissed the prior serious felony conviction enhancement even if it had the discretion to do so at the time of sentencing.

"[W]e presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' ([*In re*] *Estrada* [(1965)] 63 Cal.2d [740,] 745 [(*Estrada*)].) The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 881; accord, *People v. Frahs* (2020) 9 Cal.5th 618, 634 ["[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must

'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'"].)

Courts of Appeal considering Senate Bill No. 1393 and, in an analogous context, Senate Bill No. 620, have uniformly held that the changes apply retroactively to judgments not yet final on appeal. (E.g., *People v. Zamora* (2019) 35 Cal.App.5th 200, 207–208 [Sen. Bills Nos. 620 and 1393]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972–973 [Sen. Bill No. 1393]; *People v. Chavez* (2018) 22 Cal.App.5th 663, 711–712 [Sen. Bill No. 620]; *People v. Arredondo* (2018) 21 Cal.App.5th 493, 506–507 [Sen. Bill No. 620].) As Senate Bill No. 1393 does not contain a savings clause and there is no indication that the Legislature intended any limitation on its retroactive application, we agree with the parties that it applies to this case in accordance with the *Estrada* rule.

Regarding entitlement to remand, "'"[d]efendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion."'" (*People v. Flores* (2020) 9 Cal.5th 371, 431–432, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; accord, *People v. Johnson* (2019) 32 Cal.App.5th 26, 69; *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110–1111.) However, remand is not required when it would be an idle act. (*People v. Flores*, *supra*, at p. 432, citing *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; accord, *People v. Jefferson* (2019) 38 Cal.App.5th 399, 409; *People v. Allison* (2019) 39 Cal.App.5th 688, 705–706.)

We conclude it is unnecessary to resolve the parties' dispute regarding whether remand would be futile on the sentencing record in this case. Because the matter must be

remanded for resentencing given reversal of the gang enhancements, the issue is moot. On remand, defendant may request the trial court consider granting him relief pursuant to Senate Bill No. 1393.

## DISPOSITION

As to counts 1 through 3, the gang enhancement findings under section 186.22, subdivision (b)(1), are reversed and this matter is remanded for resentencing. Following resentencing, the trial court shall forward an amended abstract of judgment to the appropriate authorities. Except as modified, the judgment is affirmed.


MEEHAN, J.

WE CONCUR:



PEÑA, Acting P.J.



DeSANTOS, J.